**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

HDI GLOBAL SE a/s/o DAIMLER AG a/s/o    :
MERCEDES BENZ USA LLC,    :

      :          19-CV-0923 (OTW)

       Plaintiff,    :

      :       **OPINION & ORDER**

       -against-    :

INTERNATIONAL AUTO LOGISTICS, INC., et al.,    :

      :

       Defendants.    :

-----------------------------------------------------------------x

**ONA T. WANG**, **United States Magistrate Judge**:

I. **INTRODUCTION**

Before the Court, on consent, are cross motions for partial summary judgment. Plaintiff

HDI Global SE, the insurer of Daimler AG and Mercedes Benz USA LLC, ("HDI")[1], and Defendants

Fidelity Limited Partnership, Inc. ("Fidelity"), and American Roll-On Roll Off-Carrier, LLC ("ARC")

(collectively the "Vessel Defendants")[2], filed a joint motion for partial summary judgment

alleging Defendant International Auto Logistics, Inc. ("IAL") is strictly liable for damages suffered

as a result of a fire onboard a ship, the M/V HONOR, under section 1304(6) of the Carriage of

Goods by Sea Act ("COGSA"). (*See* ECF Nos. 103–106, 111, and 118). IAL then cross moved for

summary judgment seeking dismissal of all claims against IAL and a grant of summary judgment

in its favor. (*See* ECF Nos. 107–110, 115). For the below reasons, HDI and the Vessel

Defendants' motion is **DENIED**. IAL's motion is **GRANTED** in part and **DENIED** in part.

---

[1] HDI is the lead subrogated underwriter of a consignment of Daimler vehicles damaged on board the M/V HONOR in February 2017. (ECF 105 at 1; ECF 109 at 1).
[2] Fidelio is the registered owner of the M/V HONOR and ARC was the charterer and operator of the M/V HONOR. (ECF 105 at 1; ECF 109 at 1).

## II.    BACKGROUND

### a.   Relevant Factual History.

The M/V HONOR is an ocean-going roll-on roll-off (or "Ro-Ro") ship specifically designed to carry motor vehicles such as trucks and cars, which are driven on and off the vessel (ECF 105 at 3; ECF 109 at 2).[3] The ship contains 12 car decks below the main deck and a cargo deck called the garage or upper deck. *Id*. In the spring of 2014, Defendant IAL was awarded a contract with the U.S. Department of Defense ("DOD") under which it was responsible for transporting privately-owned vehicles ("POVs") of DOD employees, or service members, from one location to another as the DOD deployed service members to different locations. (ECF 105 at 2; ECF 109 at 2). Specifically, IAL prepared POVs for shipment to their intended destination and arranged appropriate transportation. (ECF 105 at 3; ECF 109 at 2). IAL and ARC were parties to an Ocean Carrier Agreement dated March 13, 2015, pursuant to which IAL (listed as shipper) engaged ARC (listed as carrier) to transport the POVs IAL was contracted to transport under the DOD contract. (ECF 105 at 2; ECF 109 at 2; ECF 118-5 – Exhibit 5: Ocean Carrier Agreement). ARC was the charterer and operator of the M/V HONOR (ECF 104 at 5–6), and issued a bill of lading for each POV to be transported. *Id*. at 8. In February 2017, the M/V HONOR was loaded for transit from Bremerhaven, Germany to Baltimore, Maryland. (ECF 105 at 6–7; ECF 109 at 5). Loaded on board were 152 POVs that IAL delivered to Bremerhaven as well as 750 new Daimler vehicles. *Id*. The POVs were stowed in the upper deck and the Daimler vehicles were stowed in decks 1 and 3, as well as the ramp leading from deck 1 to the upper deck. *Id*.

---

[3] Citations are to the parties' Rule 56.1 Statements of Undisputed Facts.

Upon leaving Bremerhaven, the M/V HONOR transited to Southampton, England. *Id*. On February 23, 2017, the M/V HONOR departed Southampton for Baltimore. (ECF 105 at 8; ECF 109 at 5). At 3:04 a.m. on February 24, 2017, the smoke alarm sounded for a fire on the upper deck. *Id*. The crew worked to put out the fire by discharging $CO_2$ into the upper deck and decks 1, 2, and 3. (ECF 105 at 9; ECF 109 at 6). The ship returned to Southampton where an inspection showed that 16 POVs were "completely burnt out." *Id*. HDI alleges that the Daimler vehicles on the upper deck, and decks 1 and 3 "all suffered physical damages as a result of the fire." (ECF 105 at 9).[4] It is undisputed that investigations of the accident determined that the fire originated from a 2010 Nissan Rogue owned by service member Francis Ekudi, which was to be shipped from Bremerhaven, Germany to Galveston, Texas. (ECF 105 at 5; ECF 108 at 9; ECF 111 at 16–17; *see also* ECF 106-6 – Movants' Exhibit 10: Mr. Ekudi's Bill of Lading). The exact <u>cause</u> of the fire, however, remains a genuine issue of material fact. (ECF 115 at 2). What is known is that the Nissan Rogue, which had been inspected before being loaded aboard the M/V HONOR like the rest of the POVs being transported,[5] had an open safety recall that was **not** the origin of the fire. HDI asserts that "[t]he fire originated from a latent condition in the ROGUE unknown to the shipper IAL and unknown to the Vessel Interests" and that the fire originated from "a defect in the vehicle's starter motor solenoid." (ECF 105 at 10). IAL contends that "[t]here is no evident [sic] that the ROGUE had a latent defect," "the cause of the fire remains undetermined[,]" and

---

[4] In response to this statement in ECF 105, IAL stated: "Deny. This allegation is supported solely by reference to allegations in HDI Global's complaint and not to any record evidence."

[5] *See* ECF 106-5 at 3 – Movants' Exhibit 9. The Court has sealed this document as HDI and the Vessel Defendants failed to redact Mr. Ekudi's PII before filing the Exhibit as part of its 717 page Declaration in Support of Movants' Motion for Partial Summary Judgment.

"the issue with the solenoid . . . could also have been a result of the fire." (ECF 109 at 4). This lawsuit ensued.

### b. Relevant Procedural History.

Plaintiffs – Daimler, Mercedes, and HDI – the car owners and the lead subrogated underwriter of the consignment of Daimler vehicles alleged damaged in the fire, respectively, filed their complaint on January 30, 2019, alleging six claims, four against the Vessel Defendants[6] and two against IAL, sounding in strict liability (claim five) and negligence (claim six). (ECF 1 at 10–11). In February 2022, HDI settled all claims asserted against the Vessel Defendants (ECF 104 at 6; 106 at 1–2), leaving only HDI's two claims against IAL. Despite numerous settlement discussions, the Court was unable to resolve the remaining claims, and in a September 15, 2022, letter reporting on an unsuccessful settlement conference before Judge Lehrburger, HDI and the Vessel Interests sought to move for partial summary judgment on a point of law that was "stand[ing] in the way of any meaningful settlement discussions." (ECF 99). The legal issue is whether IAL is strictly liable as a shipper under section 1304(6) of the Carriage of Goods by Sea Act ("COGSA"). *Id*. On October 7, 2022, the Court directed the parties to submit a proposed briefing schedule for their partial summary judgment motion. (ECF 100).

On October 26, 2022, HDI and the Vessel Defendants filed their motion for partial summary judgement, seeking a determination that IAL is strictly liable for the damages HDI and the Vessel Defendants suffered as a result of a fire on board the M/V HONOR. (*See* ECF Nos. 103–106). On November 18, 2022, IAL moved for summary judgment and dismissal of

---

[6] The four claims asserted against the Vessel Defendants were: (1) breach of contract, (2) breach of bailment, (3) negligence, and (4) that the M/V HONOR was unseaworthy. (ECF 1 at 7–10).

Defendant ARC and HDI's motion for summary judgment in its entirety. (*See* ECF Nos. 107–110).
The motion was fully briefed on January 27, 2023. (ECF 118).[7]

### III.   DISCUSSION

#### a.  Legal Standards

##### i.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact is a dispute which "could reasonably be resolved in favor of either party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), and which must be resolved to apply the relevant substantive law. *Id.* at 248. The moving party has the burden of establishing "the absence of a genuine" dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, all facts and inferences should be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

##### ii.  Strict Liability Under the Carriage of Goods by Sea Act ("COGSA")

The parties do not dispute that a claim for cargo loss is governed by COGSA. (ECF 108 at 17). COGSA "applies to all contracts for carriage of goods by sea." *In re M/V MSC Flaminia*, 72 F.4th 430, 446 (2d Cir. 2023). HDI and the Vessel Interests' strict liability claim is premised on section 1304(6), a strict liability provision which distributes liability between shipper and carrier and which states in full:

---

[7] On July 11, 2023, IAL filed a letter notifying the court of a June 30, 2023 Second Circuit opinion, *In re M/V MSC FLAMINIA*, 72 F.4th 430, 447 (2d Cir. 2023), reversing in part a district court opinion relied on by the parties. (*See* ECF 119).

**(6) Inflammable, explosive, or dangerous cargo** Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the carrier, master or agent of the carrier, has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the carrier without compensation, and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment. If any such goods shipped with such knowledge and consent shall become a danger to the ship or cargo, they may in like manner be landed at any place, or destroyed or rendered innocuous by the carrier without liability on the part of the carrier except to general average, if any.

46 U.S.C. § 30701 (Sec. 4. Rights and immunities of carrier and ship).

Second Circuit case law, in a series of chemical cargo cases, has largely analyzed what knowledge of the "nature and character" of the cargo defeats strict liability – a high hurdle. "Strict liability will not attach to the shipper, however, when the carrier knows that a particular type of cargo in its charge is dangerous." *In re M/V MSC Flaminia*, 72 F.4th at 447 (citing *In re M/V DG Harmony*, 533 F.3d 83, 93 (2d Cir. 2008) (holding that "notice of *any* aspect of the cargo's dangerousness" is sufficient to defeat the carrier's ability to recover in strict liability)). "[A] carrier's entitlement to recovery in strict liability requires overcoming a very high hurdle: a carrier cannot invoke strict liability if it knows that a cargo poses a danger and requires gingerly handling or stowage, and nevertheless exposes the cargo to the general condition that triggers the known danger, regardless of whether the carrier is aware of the *precise characteristics* of the cargo." *In re M/V MSC Flaminia*, 72 F.4th at 447 (citing *Contship Containerlines, Ltd. v. PPG Indus., Inc.*, 442 F.3d 74, 77 (2d Cir. 2006)) (cleaned up) (emphasis in original). Parties cannot recover on a strict liability theory if a party with "notice of the general dangerousness" of the cargo agreed to transport it. *Id.* (quoting *In re M/V DG Harmony*, 533 F.3d at 93). The strict liability analysis is "binary," and the notice threshold is relatively modest: the carrier's

6

knowledge can be "incomplete" or reflect an "underestimation of the danger" and yet still preclude recovery in strict liability. *In re M/V MSC Flaminia*, 72 F.4th at 447 (internal citations omitted).

  **b.  COGSA Strict Liability Analysis**

  HDI and the Vessel Defendants assert, essentially, that IAL is a shipper for purposes of COGSA and is strictly liable under section 1304(6), pursuant to which a shipper of "inflammable, explosive or dangerous cargo" is strictly liable for damages if neither the shipper nor the carrier of such goods knew of the danger. COGSA § 1304(6), *recodified at* 46 U.S.C. § 30701 *et seq.*; ECF 104 at 10–15. They assert that "our position is that a vehicle with a hidden defect which causes it to spontaneously combust is "explosive, inflammable or dangerous." (ECF 111 at 6). IAL contends that it is not a shipper, but rather a "freight forwarder" and thus not subject to section 1304(6), and that vehicles are not "inflammable, explosive or dangerous cargo" under section 1304(6). (ECF 108 at 10–14). Even if they were, IAL further posits, strict liability cannot apply where, as here, the carrier knew of the nature and associated risks of the cargo being transported. *Id*. at 14–17.

  While the parties dispute at length whether IAL was a shipper or a freight forwarder under the law and the various contracts underpinning the parties' relationships in this case, the Court need only address two questions: (1) are vehicles "inflammable, explosive or dangerous cargo" under section 1304(6), and (2) even assuming, *arguendo*, they are, did the parties have general knowledge of the cargo such that strict liability is precluded? The Court will discuss these two issues in turn.

### i. Vehicles are not "inflammable, explosive or dangerous" cargo under section 1304(6).

HDI and the Vessel Defendants' initial motion for summary judgment puts forth two unavailing arguments. First, they argue that "[t]he Second Circuit has now held in a number of cases that a cargo which causes a fire in the cargo hold during an ocean voyage is 'explosive', 'inflammable' and/or 'dangerous'" and that "it is beyond legitimate dispute a cargo that spontaneously combusts causing damage to the innocent vessel and innocent cargo, is 'inflammable,' 'explosive' and/or 'dangerous.'" (ECF 104 at 13). HDI points to no caselaw where a Court determined that **vehicles** were dangerous cargo with the meaning of section 1304(6), however, and instead directs this Court to the Supreme Court's obscenity jurisprudence, positing that "[t]o determine whether a particular cargo is inflammable, explosive or dangerous one should, perhaps, be guided by Justice Potter Stewart, who famously declared 'I know it when I see it.'" *Id*. (quoting *Jacobellis v Ohio*, 378 U.S. 184, 197 (1964)). In their reply, having narrowed the issues somewhat, HDI and the Vessel Defendants then "readily admit" that used vehicles transported in dedicated Ro-Ro vessels "as a general proposition" are not dangerous, but put forth a second, narrower argument asserting that the specific vehicle in this case, the 2010 Nissan Rogue, was "inflammable, explosive or dangerous" cargo. (ECF 111 at 18). The Court finds HDI and the Vessel Defendants' analysis unworkable.

The four Second Circuit cases to which HDI and the Vessel Defendants point (*see* ECF 104 at n.4) all stem from incidents involving chemicals. *Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc.*, 291 F.3d 145, 149 (2d Cir. 2002) (litigation ensued from fire that broke out in cargo of 300 drums of thiourea dioxide); *Contship Containerlines, Ltd.*, 442 F.3d at 75 (fire caused by the overheating of a cargo of 512 drums of calcium hypochloride ("calhypo")); *In re M/V DG*

*HARMONY*, 533 F.3d 83, 86 (2d Cir. 2008) (explosion and fire from ten containers, each of which contained 16,000 kilograms of calhypo); *Chem One, Ltd. v. M/V RICKMERS GENOA*, 502 F. App'x 66, 70 (2d Cir. 2012) (explosion of 600 tons of a magnesium-based desulphurization reagent after two ships collided). In the fifth key Second Circuit decision that discusses section 1304(6), *In re M/V MSC Flaminia*, 72 F.4th 430, 447 (2d Cir. 2023), tanks of the chemical divinylbenzene ("DVB-80") exploded. While the Second Circuit discussed the contours of section 1304(6) in these cases, they largely accepted that the chemicals were "inflammable, explosive or dangerous" cargo or focus instead on knowledge of the cargo's dangerousness. In the one case the Court found that briefly discusses section 1304(6) in the context of a cargo of Volvo vehicles,[8] the court dismissed Plaintiffs' the strict liability claim without analyzing section 1304(6). *Atl. Container Line AB v. Volvo Car Corp.*, No. 14-CV-1811 (CM), 2014 WL 4730152, at *13 (S.D.N.Y. Sept. 22, 2014).

While the parties have presented no case on point, "[t]here are three interwoven regulatory schemes relevant to the ocean shipment of dangerous goods . . . : the Hazardous Materials Code ("HMR"), 49 C.F.R. Parts 100-185 (promulgated pursuant to the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 5101, *see* 49 U.S.C. § 5103); the International Maritime Dangerous Goods ("IMDG") Code (adopted in the United States, *see In re M/V DG Harmony*, 533 F.3d 83, 88-89 (2d Cir. 2008)); and the Safety of Life at Sea

---

[8] *Atl. Container Line AB v. Volvo Car Corp.*, No. 14-CV-1811 (CM), 2014 WL 4730152, at *13 (S.D.N.Y. Sept. 22, 2014) ("The Complaint alleges that 'one or more Volvo automobiles, which were manufactured, shipped, owned, sold and/or bought by Defendants are responsible for the fire' and that Defendants failed to inform ACL about the 'inherently dangerous, inflammable and/or explosive nature' of the cargo.").

Convention ("SOLAS"), Nov. 1, 1974, 32 U.S.T. 47 (which the United States has ratified, *see Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789, 793 (9th Cir. 1980))." *In re M/V MSC FLAMINIA*, 339 F. Supp. 3d 185, 198 (S.D.N.Y. 2018), *aff'd in part, rev'd in part and remanded sub nom. In re M/V MSC Flaminia*, 72 F.4th 430 (2d Cir. 2023). The IMDG Code – a schedule of dangerous materials maintained by the International Maritime Organization – while not controlling, "serves as an important reference for carriers seeking to transport cargo safely and efficiently while complying with international regulations." *In re M/V DG HARMONY*, 533 F.3d at 88. The Code regulates the transport of dangerous goods by sea "in order reasonably to prevent injury to persons, or damage to the ship." *Id*. at 88–89 (quoting IMDG Code 1.1 (1998)). As Defendant IAL correctly points out, the IMDG code does not list vehicles as dangerous goods. (ECF 108 at 12–13). Rather, the IMDG Codes contains the following exemption for vehicles stored and transited on Ro-Ro ships like the M/V HONOR:

> Vehicles and equipment are not subject to the provisions of this Code if they are stowed on a roll-on/roll-off ship or in another cargo space designated by the Administration (flag State) as specifically designed and approved for the carriage of vehicles and equipment and there are no signs of leakage from the battery, engine, fuel cell, compressed gas cylinder or accumulator, or fuel tank when applicable.

(ECF 108 at 13 (quoting IMDG Code Special Provision (SP) 961)).

In their opposition, HDI and the Vessel Defendants concede that "automobiles are not dangerous cargoes under the IMDG code and are not inherently dangerous" (ECF 111 at 5), but that "a vehicle with a hidden defect which causes it to spontaneously combust **is** 'explosive, inflammable or dangerous.'" *Id*. at 6 (emphasis added). The logic seems to be: the 2010 Nissan Rogue caught fire onboard the M/V HONOR, therefore, it must be "inflammable, explosive or dangerous." The Court find this circular argument unavailing. All the parties in this case are in

the business of shipping vehicles on a vessel specifically designed for this purpose. Under the

Ocean Carrier Agreement, ARC is a "[c]arrier . . . in the business of transporting vehicles via

ocean going vessels." (ECF 118-5 at 2). The M/V HONOR is one such ocean-going vessel

designed to transport vehicles. While the exact cause of the fire remains in dispute, the risk is a

known (and obvious) one. Transporting cars, particularly used ones, may present a risk of fire.

The potential of a car to combust is common knowledge, well understood even to a layperson.

The analysis of what cargo is "inflammable, explosive or dangerous" cannot proceed as to each

individual vehicle. Rather, the question is whether vehicles including POVs are "inflammable,

explosive or dangerous" under section 1304(6). The Court finds that they are not.

>    ii.   **Knowledge of fire risk precludes strict liability under section 1304(6).**

Even assuming, *arguendo*, that the cargo was dangerous, knowledge of the general risk

of fire precludes strict liability. *Chem One, Ltd.*, 502 F. App'x at 71 ("[S]trict liability under

COGSA § 4(6) turns on what the carrier knows about the dangerous nature of its cargo."). In

*Contship Containerlines, Ltd.*, 442 F.3d at 77, the court concluded that "a carrier cannot invoke

strict liability if it knows that a cargo poses a danger and requires gingerly handling or stowage,

and nevertheless exposes the cargo to the general condition that triggers the known danger,

regardless of whether the carrier is aware of the precise characteristics of the cargo." "In such a

binary analysis, a party either will know that [an exothermic] reaction is possible or it will not;

the calibrated likelihood of an exothermic reaction under a variety of heat circumstances is not

considered." *Id*. In its most recent June 30, 2023, opinion analyzing section 1304(6), the Second

Circuit reversed the district court's finding of strict liability for the loss arising from an explosion

onboard the M/V Flaminia. Analyzing the cargo in that case, tanks of DVB-80, the Court stated

that while the charterer of the ship lacked "specific knowledge of the conditions to which the

DVB-80 tanks were exposed," it did have "prior experience shipping DVB-80, and . . . was

aware, at least at the corporate level, that DVB-80 generally was heat sensitive." *In re M/V MSC

Flaminia*, 72 F.4th at 447–48.

Here, all of the parties in this case had prior experience transporting cars and would be

aware "at least at the corporate level" that a used car may present a risk of fire. This risk would

especially be understood by the parties because just two years earlier in June 2015, a similar

incident occurred aboard the *Courage*, another ARC Ro-Ro vessel carrying US POVs, new

Mercedes-Benz and BMW vehicles, and military vehicles, from Bremerhaven, Germany to

Southampton, England. (ECF 110-4 at 2 – Exhibit D: National Transportation Safety Board

Marine Accident Brief – Fire aboard Vehicle Carrier *Courage*). According to the National

Transportation Safety Board's accident brief, the cause of this incident, a fire onboard resulting

in $10 million in vessel damages and $90 million in cargo loss, was likely caused by an electrical

issue in the automatic braking system of a servicemember's POV. *Id*. at 6.

Accordingly, knowledge of fire risk precludes strict liability under section 1304(6).

## IV.   CONCLUSION

For the foregoing reasons, HDI and the Vessel Defendants' motion for partial summary

judgment holding IAL strictly liable for their damages is **DENIED**. Because as a matter of law we

find that vehicles do not fall under COGSA's strict liability provision, IAL's motion is **GRANTED** as

to the strict liability claim (claim five). What remains in this case is a fact-intensive negligence

claim (claim six) as the sole claim in this suit. HDI and the Vessel Interests point the finger at IAL

and IAL points right back, asserting that "ARC failed to inspect for leakage or otherwise to

ensure that there were no visible electrical defects and thus failed to carry in accord with the safety regulations." (ECF 115 at 7). The parties are directed to meet and confer whether further settlement discussions would be productive in light of this opinion. In the alternative, the parties should prepare for trial on the remaining negligence claim asserted against IAL. The parties are directed to file a letter as to their intentions **by Wednesday, May 1, 2024**.

The Clerk of Court is respectfully directed to close ECF Nos. 103 and 107. The Clerk of Court is further directed to seal ECF 106-5 to the Court and parties only.

**SO ORDERED.**


_/s/ Ona T. Wang_

Dated: March 25, 2024                                        **Ona T. Wang**
     New York, New York                            United States Magistrate Judge